THE CITY OF CHESTER.

THE J. S. W. HOLTON.

(District Court, E. D. Pennsylvania. June 20, 1914.)

Nos. 51–53 of 1908, and 13 of 1909.

1. COLLISION (§ 102*)—STEAM VESSELS MEETING—BOTH VESSELS IN FAULT.

The steamboat City of Chester, passing down the Delaware river in the evening on the east side of the channel, came into collision with and sunk the tug Holton, coming up. The night was clear and still, and when about a half a mile apart the vessels, which were nearly head on, but slightly to the starboard of each other, exchanged signals for passing port to port. The steamer was moving at a speed of about 16 miles and the tug 8 or 9 miles an hour, and the steamer struck the tug about amidships on the port side with great force. *Held*, on conflicting evidence, that the collision resulted from the fact that both vessels miscalculated the distance between them and the combined speed, and failed to promptly and sufficiently change their courses to starboard, for which both were in fault; that the steamboat was also in fault for not continuing such starboard course longer, for which there was ample room, and the tug for being unnecessarily so near the western side of the channel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

2. COLLISION (§ 115*)—SUITS FOR DAMAGES—BOTH VESSELS IN FAULT—LIA-
BILITY FOR DEATH OF MEMBERS OF CREW.

Representatives of members of the crew of a vessel, killed in a collision
for which both vessels were in fault, are entitled to a decree in solido
against either vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247; Dec.
Dig. § 115.*]

In Admiralty. Suit for collision by the owners of the steam tug.
J. S. W. Holton against the steamboat City of Chester, the Wilmington
Steamboat Company, claimant, with cross-libel, and libels by Clara F.
Adkins and A. Virginia Lynch, respectively, against the Wilmington
Steamboat Company, for death of members of crew of the Holton.
Decree in favor of each vessel against the other for half damages, and
for each libelant against the steamboat company in the suits in per-
sonam.

Howard M. Long, of Philadelphia, Pa., for the J. S. W. Holton
and others.

H. Alan Dawson, of Philadelphia, Pa., for the City of Chester and
others.

JOHN B. McPHERSON, Circuit Judge. By agreement of counsel
these four cases were heard together upon the same evidence. The
cross-libels seek to fix the liability for a collision between the river
steamboat City of Chester and the ocean-going tug J. S. W. Holton,
and the other libels are for the resulting deaths of two members of the
tug's crew. The home port of the steamboat is Wilmington on the
Delaware river, and her business is the regular and frequent carriage
of freight and passengers between the cities of Philadelphia, Chester,
and Wilmington. She is an iron vessel, 185½ feet long, 28 feet beam,
and 9 feet depth of hold, and belongs to the Wilmington Steamboat
Company, sometimes called the Wilson Line. The tug was also of
iron, but of course much smaller, about 70 feet long, 16 feet beam, and
7½ feet depth of hold, and 62 gross tons in measurement. Certain
facts are undisputed, and may be premised.

[1] On the evening of Friday, September 11, 1908, the steamboat,
after a stop at Chester, was going down the river on a regular trip to
Wilmington, carrying passengers and freight, and the tug without a
tow was coming up the river from Wilmington to a stone wharf at
Bellevue, Del. Owing to a break in her steering gear (which occurred
as she was leaving Philadelphia) the steamboat was almost an hour
behind her schedule time. Both vessels were seaworthy and properly
equipped. The hour was 9:30 or thereabouts, the flood tide was in
the first quarter, and the wind was light and not disturbing. The night
was fair, both the stars and the moon being visible, and there was no
obscuring haze on the water. All the proper lights of both vessels were
set and burning, and the electric lights of the steamboat were also in
service. The tug was in charge of a skillful and experienced master,
who was in the pilot house steering, and also keeping the lookout,
while the chief engineer and a fireman were on duty in the engine room.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The mate, the assistant engineer, and the other fireman, had already turned in. The master of the steamboat was also skillful and experienced, and, although he was not in the pilot house forward on the hurricane deck, he was close at hand. Her wheel was in charge of the first officer, a licensed and competent man, and the second officer was also in the pilot house, while a lookout was stationed forward on the main deck. The collision took place on the western side of the river, near the government buoy wharf at Edgemoor in the waters of the state of Delaware, and above buoy No. 28, which lies at the turn from the Cherry Island Range to the Bellevue Range or Reach. The blow was delivered by the stem of the steamboat nearly amidships on the port side of the tug, one result being that the tug filled and sank almost immediately. The mate and the assistant engineer may have been drowned, but more probably they were killed in their berths, either by the blow or by escaping steam. Their bodies were recovered a few days later. The tug was afterwards raised, and photographs were taken, showing the injury to her side. The place of the collision was in the western half of the channel, and this fact, together with the character of the blow, is fixed with substantial accuracy. The deepwater channel along the two ranges is 500 to 600 feet wide, but for vessels drawing no more than the steamboat and the tug there was plenty of additional room between the edge of that channel and the western shore.

On the other facts the case presents a square conflict of testimony after the usual fashion. In outline the theory of the tug is as follows: She had put into Wilmington for a short stop, and had then come down Christiana creek to the river, turning north toward Bellevue, which is also on the western bank about 3½ miles distant from the mouth of the creek. The channel runs along the Delaware, or western, shore for several miles above Wilmington. When she had gone about a quarter of a mile above the mouth of the creek and had reached a point in the river about three-quarters of a mile below Edgemoor Light, her master in the pilot house saw the electric lights of the steamboat coming down the river. The tug was then heading northeast, but was still on the westward, or Delaware, side of the channel, and the steamboat was about a point or a point and a half on the starboard bow of the tug. At first only the electric lights of the steamboat were seen, but almost at once both her side lights also came into view. When the vessels were about a half mile apart the steamboat blew one whistle, signifying her intention to pass to the westward, and the tug accepted and answered the signal immediately, putting her wheel to port at once and directing her course to the eastward. When this signal was given and accepted the vessels were nearly end on, each showing both her side lights to the other. The tug was going at full speed with the tide, making eight or nine miles an hour, and she immediately responded to her wheel, changing her course more to the eastward, or New Jersey, side of the river. After the exchange of signals, the steamboat appeared to change her course to the westward, shutting out her green light and showing only her red light to the tug. Both vessels continued on these courses for a short time, each showing her red light to the

other. The steamboat—which was 50 minutes behind her schedule time and was running about 16 or 17 miles an hour—suddenly changed her course to the eastward without slackening speed, and showed both her lights, thus indicating that she was coming directly at the tug, which was still showing her red light to the steamboat. The vessels had now approached within 200 or 300 yards, and the master of the tug, realizing the imminent danger of collision, blew four blasts of his whistle (which were not answered) and rang four bells to the engineer to stop and reverse. But the vessels were so near, and the speed of the steamboat was so great, that the engineer could only stop the engine and had no time to reverse, being compelled to leave the engine room without a moment's delay in order to save his life. Immediately thereafter the collision occurred, the stem of the steamboat striking the tug with great force about amidships on the port side, cutting several feet into the tug, breaking the steam pipe and cylinder, and doing so much damage that the tug sank within a few minutes. She hung on the steamboat's bow long enough to allow the master of the tug, the chief engineer, the two firemen, and a deck hand to escape, but the mate and the assistant engineer lost their lives. The steamboat lowered a boat and played her searchlight on the water in an effort to find the missing men, but the effort was in vain.

The cross-libel gives the following account of the occurrence: The steamboat was properly manned, equipped, officered, and supplied; her proper lights were set and burning brightly; a duly licensed and competent man was at the wheel in the pilot house at the forward end of the hurricane deck; the master was in the pilot house or about the decks; the second officer was also in the pilot house, keeping a lookout and assisting the man at the wheel; a competent hand was on lookout forward on the main deck; and the other officers and crew were properly stationed. She left Philadelphia about 7 o'clock for Wilmington, calling at Chester on the way. Soon after leaving Chester the tide became flood, and was about quarter flood when the collision took place. As the steamboat approached Edgemoor, running on the westward, or Delaware, side of the channel in the proper and regular channel course at a speed of about 16 miles an hour through the water, she saw the green light of the tug somewhat on her port bow, indicating that the tug was heading westward. Almost immediately, however, and before signals could be exchanged, the red light of the tug also came into view, so that both lights were seen somewhat on the steamboat's port bow, thus indicating that the tug was swinging to the starboard or eastward. As soon as both lights of the tug appeared, the steamboat blew one blast, and the tug answered promptly by a similar signal. Both vessels, therefore, had agreed that they would direct their respective courses to starboard, and would pass at a safe distance, port to port. When the signals were exchanged, the tug was less than half a point on the steamboat's port bow, showing both lights, so that the vessels were practically end on. They were then less than a half mile apart, and the steamboat was moving at full speed, her rate being about 16 miles an hour through the water. As soon as the signal was given, the steamboat put her wheel to port and held it there, the course being

215 F.—11

changed at once to starboard and to the westward, so that the green light of the tug was shut out and only her red light was visible. This position was safe, but soon afterwards the tug changed her course to port and to the westward, again showing both her lights to the steamboat, and held this course to port so long that she shut out her red light and showed only the green. This would indicate that she was going to the westward, in the apparent effort to cross the steamboat's bow and to pass starboard to starboard, in violation of her duty under the signals that had been exchanged, and in violation of the rules of the road and of the requirements of safe and prudent navigation. As soon as the appearance of the tug's green light indicated that she had improperly changed her course to the westward, the steamboat put her engines full speed astern, and set her wheel hard aport, so that her speed through the water was quickly reduced, and her own course was changed rapidly still farther to the westward. When this improper change of course was made by the tug, and the engines of the steamboat were put full speed astern, the tug was almost dead ahead, and the vessels were about 1,000 feet apart. The tug continued to hold her improper course to the westward until she came close to the steamboat, when she made another change of course, this time to the eastward, apparently changing her mind a second time and deciding now to carry out the original maneuver according to the signal and to pass port to port. She succeeded in swinging far enough to the eastward to head in that direction, shutting out her green light again and showing only the red, but she was now directly under the steamboat's bow. Being in this position, she suddenly put her engines astern, stopping or greatly delaying her movement to the eastward, so that she was held practically without motion across the steamboat's bow, and was carried by her own momentum and by the set of the flood tide into the steamboat, her port side about amidships striking upon the sharp bow of the steamboat. When the collision took place, the steamboat had lost her headway and had nearly stopped moving, both over the ground and through the water.

These conflicting theories are maintained in the voluminous testimony of both vessels, and in the elaborate and excellent briefs of counsel. I have read and considered the whole record and both the arguments, but I see no advantage in an extended discussion. Two prominent facts exist that cannot be explained away and must be accounted for, namely, the facts that the tug was struck amidships on her *port* side, and that she was struck so heavy a blow as to send her to the *bottom within a few moments of the collision*, and to inflict much damage upon the steamboat also. It is certain that the vessels must have come together at an angle not far from 90 degrees, and that the steamboat must have been in rapid motion. The tug's side was penetrated several feet—indeed an oil cup from her engine was found on the steamboat's bow after the latter arrived at Wilmington—and the steamboat's bow was so badly injured on both sides for several feet back from the stem that she also would probably have sunk if her collision bulkhead had not kept her afloat. It is idle to argue that the tug was practically drifting with the tide, and that the way of both vessels

had nearly stopped; and it is clear, I think, that, although the steamboat reversed, this expedient was adopted too late to have much, if any, effect on her speed. Neither is it credible that the tug went through the extraordinary maneuvers set forth in the cross-libel unless it be supposed that her master had taken leave of his senses. Moreover, both the steamboat's theory and her supporting testimony allow much too short a time for these remarkable evolutions, and accordingly I regard the theory as improbable. But I cannot accept in all its details the account given by the tug without supposing that the first officer of the steamboat was doing a similar violence to prudent navigation. It is not to be believed that he deliberately or recklessly followed the tug and ran her down. As it seems to me, the collision can be explained in a way that lays little, if any, strain upon probability, and is also in general accord with the testimony, especially of the disinterested witnesses. I refer to those members of the "Shawmut's" crew that watched the occurrence from the deck of their own vessel, which happened to be in the neighborhood on the eastern side of the channel, and the testimony of two persons who were on a launch somewhat below the point of collision, and were coming up the river not far from the center of the channel. Some of this testimony was given within a reasonable time after the occurrence, and some of it much later, so that the different accounts are of varying value. Taking everything together, in my opinion the ultimate facts are these:

The tug and the steamboat were both in the western half of the channel. They saw each other in ample time to avoid the collision, but they were closer together than either of them believed. They both failed to judge the situation accurately, miscalculating the distance, and the combined speed. They were then nearly head on, the only point of disagreement here being that the tug places herself a point, or a little further, on the steamboat's starboard bow, while the steamboat places her on the port bow. I think the tug's account is more probable, and accept it as true. She had left Wilmington not long before, and was more likely to be to starboard of the steamboat than to port, especially as she was bound to a point not far away on the western side of the river, and was likely to be saving time by taking this course. I think she was at fault in being where she was; she ought to have been farther to the eastward, and she had had ample time to get over to a safe and proper position in the channel. It was a risk to be on the wrong side, although she was moving in the right direction. But, in spite of the tug's being to starboard, the steamboat offered to pass port to port, and I do not criticise her for so doing, as the tug was nearly head on. But, as the vessels were somewhat to starboard of each other, the execution of this maneuver would evidently require each to go somewhat farther to gain a position of safety than if they had undertaken to pass starboard to starboard, and therefore each was bound to take this increased distance into account. Here, also, I think the steamboat was at fault. She did go to starboard, or to the westward, in accordance with her signal, but she did not go far enough, and straightened up too soon. As her witnesses say, her change of course from first to last was not more than two points. Evidently the

vessels were closer than they supposed—this is also the opinion of the master of the steamboat—and it must be continually kept in mind that they were covering the intervening space at the combined rate of 24 or 25 miles an hour, or nearly a mile in two minutes. Or, if they began their maneuvers when they were a half mile apart, a little more than a minute is the whole time available for everything that was done. I do not think either is to be blamed for excessive speed, but speed was a most important factor that neither could safely leave out of account or misjudge. As usual, the estimates of time in the testimony are for the most part not to be accepted literally; if they were accurate, it is hard to see how the collision could have occurred. If the steamboat had gone even 50 yards further to starboard—and she had plenty of room, and plenty of time also if her testimony on this point were reliable—nothing would have happened; but she was behind her schedule time and evidently in a hurry, so that she cut down the margin of safety too far. And, if the tug had been on the proper side of the channel, where she could easily have been, there would not even have been a crisis. I do not pass upon the other faults charged against either vessel, since those I have noticed are sufficient to account for the disaster.

A decree finding both vessels at fault may be entered, and referring the question of damages to a commissioner.

[2] But there is no reason for further delay in the matter of the damages sustained by the widows of the mate and of the assistant engineer. They are each entitled to a decree in solido against the owner of the steamboat (The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264), who may be left to such ultimate remedy as may exist against the tug. The evidence on the subject of the widows' damage has already been taken, and is now before the court. Both men were, and always had been, in excellent health, and both were industrious and sober. They had been steadily employed with only occasional short periods of idleness, and at the time of his death each was earning $65 per month and his board, devoting much the larger part of his wages to the support of his family. Lynch was 25 years old and had no children. Adkins was 39 years old and had five children, whose ages ranged from 1 to 12 years in 1908. It is not easy to estimate what would be a fair and legal allowance for the damage sustained by each family, taking into account the chances of death, sickness, and unemployment during the life expectancy of the head of the family; but in my best judgment the respective sums are $4,500 and $5,500.

The clerk is therefore directed to enter a final decree against the owner of the steamboat in favor of A. Virginia Lynch in the sum of $4,500, and a final decree in favor of Clara V. Adkins in the sum of $5,500, with costs to each of these libelants.